# APRIL TERM, 1866, AT DETROIT.

⊸◇⊱

## James W. Converse v. Laura Blumrich and others.

*Contract for sale of land. Forfeiture.* The vendor in a contract for a sale of land, by which he is to make conveyance at a future time, on payment of the purchase money, cannot forfeit such contract as against the vendee, when such vendor has no title and is not in a condition to fulfill his part of the contract.

*Estoppel,—Consideration.* The complainant, having received an assignment of the vendor's rights in a contract of sale, and recognized the vendee's rights, afterwards and without any new consideration, made a re-sale of the same property to the same vendee for a higher price, and took a mortgage for the balance of the purchase money. *Held*, that the complainant, by his acts, had recognized the original contracts, and that no benefit passed to the vendee by the new agreement beyond what he was already entitled to; and, therefore, complainant cannot recover on the mortgage.

*How such contracts may be forfeited.* The lapse of time alone could not put an end to these contracts; for time is not of the essence of the undertaking to pay money by such a contract; and default in payment must be followed by some act of the vendor indicating his election to consider the contract at an end, before it would be terminated.

*Notice to purchasers of the rights of third parties.* Buying the title or rights of the vendors in such contract, with knowledge of equities in their vendees, the purchaser becomes liable to the same extent, and in the same manner, as the persons from whom he bought.

*Compromise of conflicting claims.* Where a fair settlement of conflicting claims is made between parties, it is binding upon them, even though they may have yielded legal rights; and the law should favor and encourage such settlements. But the mortgage in this case, being given in the full belief, induced by the acts and statements of the mortgagee, that the rights of the latter were paramount to any which could be claimed under the original contract, and that he had done nothing to recognize or make himself responsible for the sales by the vendors of the mortgagor, which statements were not true, this cannot be considered a compromise of conflicting claims. And the mortgagor is entitled to have the mortgage procured by them set aside, as obtained by fraud, unless he was, at the time, chargeable with such notice of the facts as should preclude him from complaining.

*Constructive notice.* A person is chargeable with constructive notice when, having the means of knowledge, he does not use them. If he has knowledge of such facts as

would lead any honest man, using ordinary caution, to make further inquiries, and does not make, but studiously avoids making such obvious inquiries, he must be taken to have notice of those facts which, had he used such ordinary diligence, would have been readily ascertained.

*Party in interest bound by information given.* The person so put upon inquiry can not be bound to do more than apply to the party in interest for information, and will not be responsible for not pushing his inquiries further, unless the answer which he receives corroborates the prior statements, or reveals the existence of other sources of information.

*Constructive notice does not relieve from fraud.* The law of constructive notice can never be so applied as to relieve a party from responsibility for actual misstatements and frauds.

*Admissions of agent.* The admissions of an agent are evidence against the principal, only when they constitute a part of the *res gestæ.* They must accompany the transaction in which the agent acted; what he states at a subsequent time is inadmissible.

*False statements ignorantly made.* If one obtains the property of another by means of untrue statements, though in ignorance of their falsity, he must be held responsible as for a legal fraud.

*Person misleading another bound by his statement. Required only to seek the best authority.* When one seeks the best authority to ascertain the truth of rumors, and is then misled, the person so misleading cannot be permitted to profit thereby.

*Relief must be founded upon the bill, &c.* The bill in this case having been filed for the sole purpose of foreclosing the mortgage, whatever other rights complainant may have, they cannot be enforced in this suit, if the mortgage fails. (*Peckham v. Buffam,* 11 *Mich.* 529; *Perkins v. Perkins,* 12 *Id.* 456; *Moran v. Palmer,* 13 *Id.* 367.)

*Vendor's Lien.* The complainant retains a vendor's lien upon the land, which he may enforce in equity, if defendants refuse to pay; but it must be in a suit brought for that purpose.

*Heard January 5th. Decided April 4th.*

Appeal in Chancery from Kent Circuit.

The bill was filed by the complainant in this cause, to foreclose a mortgage executed by one Wenzel Blumrich, (the husband of said Laura Blumrich, and the father of said infant defendant,) in his life-time, to said complainant, and said defendants resist such foreclosure upon the ground that said mortgage was fraudulently obtained and without consideration.

The facts sufficiently appear in the opinion.

*Miller & Wilson,* for complainant.

1. Misrepresentation, to constitute fraud, must be in regard to a matter of *fact* and not merely of *opinion;* and some-

thing which a party must have a right to rely on. 1 *Story Eq. Jur. sec.* 197; 2 *Pars. Con.* 270, 275; 1 *Hill. Vend.* 344, *n.;* 1 *Story Eq. Jur.* § 199; 2 *Kent's Com.* 484.

A party must use means of knowledge in his reach. 1 *Story Eq. Jur.* § 200, *a.*; 3 *Story's R.* 659.

2. That notice is sufficient which should put a party upon inquiry. 1 *Hill. Vend.* 401.

3. Notice to attorney or agent is notice to principal. 1 *Hill. Vend.* 406–7.

4. The testimony of complainant concerning transactions with Blumrich is competent under the statute. (*Sess. Laws* 1861, 168.)

"Representatives of deceased person" means only executors and administrators. *Bouvier's Law Dic. Title Representatives,* (3); 12 *Abbott's Pr.* (*N. Y.*) 1; *Cited in* 6 *Abbott's N. Y. Dig.* 597, (35, 36).

*Miller & Rogers* and *George Gray*, for defendants.

1. The contract could not be forfeited or rescinded by the Union. 2 *Parsons on Con.* 191–2–3.

2. No steps had been taken by the Union to recover the possession of the premises. The contract remained in force until complainant procured his deed. 11 *Mich.* 9.

3. Complainant cannot deny the legal effect of the assignments, to himself, of Johnson and Coggeshall, but takes their equitable title and the legal title of the Union, subject to the Blumrich contracts. — 1 *Blackf.* 91; 1 *Johns. Ch.* 288; 7 *Id.* 65; 6 *Id.* 398; *White & Tudor's Eq. Cases, Vol. 2, pt.* 1*st,* 37–90, *and cases there cited.*

4. A party will be precluded from denying his own acts or admissions, which were designed to, and did influence another, when such denial will operate to the injury of such other, or those claiming under him.—8 *Wend.* 480; 3 *Hill,* 215, *and cases there cited.*

5. At the date of the new arrangement,—June 1st, 1857,—Blumrich was entitled to receive his deeds, the original contracts being in full force and virtue.—11 *Mich.* 9.

6. Neither equity nor law will enforce a contract which is without consideration.—12 *Barb. S. C.* 685; 7 *Mass.* 449; 1 *Parsons on Con.* 350, 363; *Chitty on Con.* 25, *and notes.*

Complainant's bill should have been dismissed. If the case made by his bill is not sustained, he cannot have any relief on other grounds. — 6 *Selden,* 363; 4 *Barb. S. C.* 265; 1 *Barb. Ch. Prac.* 339.

COOLEY J.

The bill in this case was filed against the widow and heirs at law of Wenzel Blumrich, deceased, to foreclose a mortgage given by him to the complainant. The defense is, that the mortgage was procured by fraud, and is without consideration.

It appears that on October 25, 1847, the American Baptist Missionary Union, a corporation existing under the laws of Massachusetts, and which then claimed a right to certain premises in Grand Rapids, entered into a contract for the sale of the same to Simeon M. Johnson and Thomas J. Coggeshall, for the sum of $13,500, payable as follows: $3,000 May 1, 1848, and $10,500 at the option of said Johnson and Coggeshall, either on said first day of May, 1848, or in six annual payments of $1,750 each, commencing on the first day of May, 1849, with annual interest. The legal title to the land was then in the United States; and Johnson and Coggeshall were authorized by the contract, at their own expense, to procure a patent in the name of said corporation, and to compromise, adjust, and settle any claim it might have against the United States in respect thereto, and "all claims to said lands and improvements;" and they were to receive a quit-claim deed of the lands when the payments were fully made. The contract also contained a provision entitling the purchasers to a deed whenever the corporation obtained its title, on their giving back a mortgage to secure the unpaid instalments, and in that case the corporation agreed to release from the mortgage, from time to time, any parcels sold by the purchasers, on re-

ceiving, to be applied on the mortgage, the amount for which such parcels were sold. The contract contained no clause of forfeiture.

At this time the premises were claimed adversely to the corporation by one Turner, and a suit was brought in its name in the United States Circuit Court against him. But Johnson and Coggeshall proceeded to lay off village lots, and to make sales thereof, for which they gave executory contracts. Among these were three to Blumrich; one dated November 3, 1849, agreeing to convey to him lot two in block two, on the payment of $200, as follows: $50 down, and the balance in three annual payments, with interest; the second, dated April 1, 1850, and agreeing to convey to him lot one in the same block, on payment of $200 in similar payments; and the third, dated October 1, 1850, agreeing to convey lot six in the same block, on the payment of $200, in four annual payments. The first two of these were given in the name of Thomas J. Coggeshall, by George Coggeshall, as his attorney, and the third in the name of Nathaniel Coggeshall, by the same attorney. In each it was agreed that a deed should be given, conveying the lot when payment was made, and that in case of failure on the part of Blumrich "to fulfill the covenants, conditions and agreements therein expressed, then such contract to be void at the election of the party of the first part." Blumrich went into possession of these lots, and made valuable improvements upon them.

Johnson and Coggeshall seem to have done very little towards performance of their contract with the corporation, and on May 12, 1853, its treasurer addressed them a letter, stating that Converse was about to visit Grand Rapids, and that he was fully authorized to make any arrangement with them in regard to the lands; expressing the hope that they would arrange for the speedy payment of the notes which they had given for the instalments payable by their contract; and requesting them to deliver to him the patent which had been issued to the corporation therefor. Converse called

upon them accordingly, and as the result of some negotiation, obtained from Johnson an assignment of all rights which he had under the contract to himself. At this time four hundred dollars remained unpaid on the three Blumrich contracts.

It will be observed that the Blumrich contracts were not all given by Thomas J. Coggeshall, and that they take no notice of Johnson's interest, though there is some evidence that George Coggeshall acted as agent for him also in making them. There is also some evidence that both the original purchasers had assigned to Nathaniel Coggeshall before this transfer to Converse, but the assignments are not in evidence, and as there is no showing that any of the Coggeshalls disputed Johnson's right, we are probably warranted in assuming that an undivided one-half of all rights at that date existing in the original purchasers under their contract with the corporation, was transferred to Converse by Johnson's assignment. It becomes important, therefore, to determine what those rights were, and also to ascertain what rights, if any, Blumrich possessed under his contracts at the date of the assignment.

Converse in his testimony assumes that he got nothing by the Johnson assignment, because the contract of purchase had become a nullity. This assumption has no better basis than the fact that the purchasers were in default in their payments. It will be seen that the letter from the treasurer of the corporation to Johnson and Coggeshall recognized their contract as still possessing validity. Some question is made of the right of the treasurer to give such a letter, but it is of little importance in this suit, as there is no evidence that any act whatever was done by the corporation to terminate the contract prior to May 1, 1855 ; and up to that time, Johnson and Coggeshall and their assigns were entitled to compel specific performance of the contract, on making payment. The corporation not only had a right up to that time to demand payment of the purchase money, but was actually seeking to obtain it; and it was not authorized to treat the contract as void, so far as it

imposed obligations upon the vendor, and still enforce it against the vendees. All the acts of the corporation show that a forfeiture of the contract was neither attempted nor desired; but that the intention was to deal with the vendees with indulgence and liberality. It seems like supererogation to say that the vendees and their privies were not entitled to insist that the contract should be forfeited, for their own default, against the wish of the corporation; but the position of Converse in this case seems to require the statement.

The contracts of Blumrich were also in full force when the assignment was made by Johnson; for though Blumrich was then in default in his payments, the Coggeshalls had never seen fit to exercise the option, reserved to them by the contracts, to forfeit them. The lapse of time alone could not put an end to them; for time is not of the essence of the undertaking to pay money by such a contract — (*Wallace v. Pidge,* 4 *Mich.* 570; *Bomier v. Caldwell,* 8 *Id.* 463; *Morris v. Hoyt,* 11 *Id.* 9; *D'Arras v. Keyser,* 26 *Penn.* 249; *Young v. Daniels,* 2 *Clarke, Iowa,* 126; *Jones v. Loggins,* 37 *Miss.* 546;) and default in payment required to be followed by some act of the vendor indicating his election to consider the contract at an end, before it would be terminated. (*Chrisman v. Miller,* 21 *Ill.* 227; *Moore v. Smith,* 24 *Id.* 512; *Brink v. Morton,* 2 *Clarke, Iowa,* 411; *Young v. Daniels, Id.* 126.)

Whether Blumrich was in position at this date to enforce his contracts against any one but the holder of the Coggeshall interest, might depend upon facts not sufficiently explained by this record. The question was made immaterial by subsequent transactions. It seems, however, that Converse recognized the Coggeshall contracts, for he made the following indorsement upon a list of them, which he gave to George Coggeshall: "I hereby covenant and agree to convey, by quit claim deed, to George Coggeshall, Esq., for all the within described lots of land, when the balance due on said lots is paid to me, with the interest at seven per cent. per annum, from the dates as specified above. Grand Rapids, June 3

1853.  J. W. Converse." The Blumrich contracts are specified in this list. There is again at this point a want of full explanation, and the consideration for this instrument does not perhaps sufficiently appear, though it was in some way connected with the purchase from Johnson, and would seem to have been required as a condition of the assignment. Converse testifies that it was given only to protect George Coggeshall against the claims of those who had taken contracts from him as agent, and fulfilled them; and he assumes that the understanding expressed by this paper is confined to such contracts; but his mistake on this point is apparent on inspection of the paper, which by its terms authorizes payment to be made by the purchasers on all the contracts mentioned in the list.

June 23, 1854, an agreement was entered into between Converse of the one part, and Turner and Patterson, his attorney, of the other, purporting to settle the suit in the United States Circuit Court. This agreement recited that Converse had purchased the lands of the Missionary Union, and was the real party in interest in the suit; and it provided that the lands should be divided between the parties in the proportions of one-half to Converse and one-fourth each to Turner and Patterson. The only purchase which Converse had really made up to this time was the one from Johnson; but he swears that he was expecting to make a purchase of the corporation, "*independent of the contract.*" He testifies that he was not acting for the corporation in this settlement, and had no authority so to do; and whatever he may have *expected* to do in the future, it is quite apparent that he was then *acting under* the contract, and in pursuance of the authority acquired by Johnson's assignment.

Converse testifies to subsequent negotiations with the corporation, and to an unwillingness on the part of its officers to convey to him until the old contract was out of the way. He therefore made an arrangement, by which, on the first day of May, 1855, he obtained an assignment from Thomas J. and

Nathaniel Coggeshall of all their claims under the original contract. This assignment contained the following clause: "And I do hereby constitute the said James W. Converse my attorney, in my name, but to his own use and behoof, and at his own cost, risk and expense, to take all necessary and lawful steps for the complete recovery, enjoyment, use, benefit and control, of the rights and privileges guaranteed by said contract to me, for his own use and disposition, with full powers of substitution."

On the same day Converse obtained a deed from the corporation. The original contract between the corporation and Johnson and Coggeshall, was put in evidence in the case, with the word "cancelled" upon it; but when, or by whom this was written does not distinctly appear, though the fair inference from all the circumstances is, that it was done at the time of the giving of the deed to Converse.

Blumrich was still in default $400 on his contracts, and there is evidence that at one time he was advised by Patterson not to pay, because of the Turner claim to the land; and that he had said he should not do so. But not only had his vendors never elected to terminate his contracts, but no person had up to this time been in a position to do so. Equity could not allow the rights of a purchaser under such a contract to be forfeited by the vendor, when the latter had no title to convey, and was not in position to perform his own undertaking.

The testimony of Converse was taken at great length in the case, and he gives his version of the understanding between the parties as to the effect which the various instruments should have. A large portion of this testimony was intended to vary or explain the legal effect of the writings, and was therefore inadmissible; and when he testifies that his purchase from the corporation "was entirely independent of, and separate from the Johnson and Coggeshall contract," he is distinctly at variance with the facts. If he so understood the transaction, it is remarkable that everything actually done by himself assumed that contract to be in force, and that he was acquiring

rights under it. He paid a considerable sum for the assignments—$1,500 to Johnson and $500 to Coggeshall— and as by means of them he entitled himself to the benefits of the original contract, so also must he be held to have assumed their burdens. By receiving the assignments and the deed, he became assignee of both the corporation and its vendees; so that while he had a right to claim the title under the former, he became bound to perform the contracts of the latter with their vendees. Buying with knowledge of equities in these vendees, he became liable to the same extent, and in the same manner, as the persons from whom he bought. (*Le Neve v. Le Neve*, 3 *Atk.* 646, *and notes thereto in* 2 *Lead. Cas. in Eq.*; *Taylor v. Stibbert*, 2 *Ves.* 438; *Daniels v. Davison*, 16 *Ves.* 249.) Unless a deed from the corporation to Johnson and Coggeshall would have deprived Blumrich of his right to perform, a deed to Converse, after he had taken their assignments, could not have that effect.

But while Converse succeeded to the obligations of Johnson and Coggeshall, and of each of them, in respect to the Blumrich contracts, he also became vested with their rights; among which was the right to terminate the contracts at his election, for default in payment. He saw fit, however, not to assert this right; but instead thereof to give out and claim that he knew nothing of the contracts, and was in no manner bound to recognize or respect them, because his purchase was an original one from the Missionary Union, and wholly independent of the previous purchase. The Blumrich contracts are therefore still in force, unless put an end to by Blumrich himself in the transaction which resulted in giving the mortgage now in controversy. It is claimed by complainant that they were, inasmuch as Blumrich entered into the arrangement, if not with full knowledge of all the facts, at least with such information respecting them as should operate as constructive notice.

There is no evidence that Blumrich was apprised of the

negotiations between Converse and the original purchasers, or of the memorandum given by Converse to George Coggeshall in respect to the contracts which had been made. Converse, Turner and Patterson, immediately after entering into the agreement among themselves, gave out and claimed that they had a right to disregard entirely the contracts before made with Coggeshall, and they required of purchasers from him that they should either receive pay for their improvements, and surrender the lots, or else make a new purchase of them at such price as should be agreed upon. Blumrich, for a long time, refused to make any arrangement, though he expressed a readiness to pay the amount due on his contracts; but at length, on June 1, 1857, he entered into a new contract with Converse, by which he agreed to purchase the same lots at the price of $1800, paying $300 down, and three months later giving the mortgage now in suit, for the remaining $1500. The arrangement was made with Converse by the aid of one Koch, who, though not then an attorney, acted as legal adviser of Blumrich in making it. The testimony of Koch was taken in the case, and though differing from that of Converse in some respects, the differences are not so material as in any way to affect the legal aspects of the case.

Koch testifies that he went several times to see Converse, and asked him if he would recognize the Blumrich contracts. Converse replied that he knew no such contracts, and if there were any, he had nothing to do with them, was under no obligation to respect them, and would not respect them. He also said, if Blumrich did not buy the lots of him, he would dispossess him. Blumrich, after long parleying and appeals based on his poverty and large family, at last entered into the arrangement on the terms dictated by Converse, and the latter informs us, that after the papers were drawn Blumrich shook him by the hand and expressed his gratitude at the liberality with which he had been treated. No more conclusive evidence could be given, how thoroughly Blumrich was deceived, both as to his rights under the contracts, and as to the facts of the case.

Complainant now seeks to support this mortgage as given on a compromise of their respective claims. Undoubtedly where a fair settlement of conflicting claims is made between parties, it is binding upon them, even although they may have yielded legal rights; and the law should favor and encourage such settlements. But we have no doubt whatever that this mortgage was given by Blumrich in the full belief, induced by the acts and statements of Converse, that the rights of the latter were independent of, and paramount to any which could be claimed under the original contract, and that he had done nothing to recognize or make himself responsible for the sales by Coggeshall. The statements by Converse on this point were not mere expressions of opinion by him; they were statements of facts, and, if untrue in material particulars, Blumrich is entitled to have the mortgage procured by them set aside as obtained by fraud, unless he was at the time chargeable with such notice of the facts as should preclude him from complaining.

It can hardly be necessary to consider the doctrine of constructive notice at length, in disposing of this case. A person is chargeable with constructive notice where, having the means of knowledge, he does not use them. — *Mayor, &c. v. Williams,* 6 *Md.* 235. If he has knowledge of such facts as would lead any honest man, using ordinary caution, to make further inquiries, and does not make, but on the contrary studiously avoids making such obvious inquiries, he must be taken to have notice of those facts, which, if he had used such ordinary diligence, he would readily have ascertained.— *Whitbread v. Boulnois,* 1 *T. & C.* 303. But he cannot be bound to do more than apply to the party in interest for information, and will not be responsible for not pushing his inquiries further, unless the answer which he receives corroborates the prior statements, or reveals the existence of other sources of information. — *Holmes v. Stout,* 2 *Stock. Ch.* 419; *Williamson v. Brown,* 15 *N. Y.* 354. Blumrich, receiving information which led him to infer that Converse had become

chargeable with the obligations of Coggeshall's contracts, applies to Converse to ascertain the facts, and is distinctly informed by the latter that he knows nothing of such contracts, and has never obligated himself in any way to respect them. As between himself and Converse, Blumrich had fully discharged his duty by making the inquiry; and the former will not be heard to claim that Blumrich should have received and acted upon the prior information, instead of the positive statements made by himself to the contrary. When one seeks the best authority to ascertain the truth of rumors, and is there misled, the person misleading him can hardly be allowed to support rights by insisting that he should still be chargeable with the reports which he had endeavored in vain to verify. The law of constructive notice can never be so applied as to relieve a party from responsibility for actual misstatements and frauds.

But it is also said that Koch, who acted as counsel for Blumrich, was fully aware at the time, of the agreement which Converse had given to Coggeshall in reference to these contracts;—and on the familiar principle that notice to an agent is notice to his principal. Blumrich, it is claimed, is as fully bound by his settlement as if he had personally known of that agreement at the time. Without stopping to consider how far this may fall within the principles just stated, we may content ourselves with saying that there is no legal evidence to establish such knowledge by Koch. The fact was sought to be proved by a letter from Koch to Converse, dated June 19, 1857, written in the endeavor to make an arrangement for another party. In this letter Koch refers to the agreement from Converse to Coggeshall as follows: "I all the while knew that there was a writing in the hands of a certain person, of Mr. Converse, in which it was promised to convey and recognize these contracts," &c. As the date of this letter is only eighteen days after the settlement with Blumrich, the inference is drawn that Koch must have known of the writing

he refers to at that time.     Koch positively denies such knowledge.

But this letter of Koch is no evidence of the fact as against Blumrich.     There is no ground upon which it would be claimed to be affirmative evidence, except as an admission of Blumrich's agent.     But the admissions of an agent are only evidence against the principal when they constitute a part of the *res gestæ.*   They must accompany the transaction in which the agent acted;  what he states at a subsequent time is inadmissible. — *Thallhimer v. Brinckerhoff,* 4 *Wend.* 394; *Hubbard v. Elmer,* 7 *Id.* 446; *Vail v. Judson,* 4 *E. D. Smith,* 165;  *Fogg v. Child,* 13 *Barb.* 246; *Budlong v. Van Nostrand,* 24 *Id.* 25.   The rule that would allow an agent, after a transaction is closed, to admit away the rights of his principal, would be too dangerous to be tolerated for a moment. — *Benedict v. Denton, Walk. Ch.* 336; *Horner v. Fellows,* 1 *Doug. Mich.* 51.

There are two very significant facts in this case to which we have not yet alluded.   One of these is, that Converse while claiming not to have recognized the Blumrich contracts, actually, through George Coggeshall as his agent, received interest upon them in March and May, 1854, settling the accounts therefor in April, 1856.   This not only recognized the contracts, but treated them as in force at the time these payments were made.   It does not appear, nor is it likely, that Blumrich, when making them supposed Coggeshall was acting in any different capacity than when he made the contracts; but it now appears that he was acting as agent for, and paying over the money to Converse, notwithstanding the positive assurances of the latter that he had never recognized the contracts upon which he was thus receiving payments.

The other item of evidence referred to is an endorsement made by George Coggeshall on the list of contracts upon which Converse's agreement to him had been written, in these words:  " It is hereby understood and agreed this day, that Mr. Converse is not held to give any deeds on any bonds that

have reverted. 11 May, 1855." The date of this is ten days after Converse acquired his deed from the Missionary Union, and it will be seen that it modifies the agreement of Converse, of June 3, 1853, by which he had promised to convey all the contracted lots. Why this endorsement was made, unless for the purpose of narrowing the obligation which Converse supposed to rest upon him, we are unable to perceive. The date is significant, as being coincident in time with the claim set up by Converse to disregard the Coggeshall contracts, and its peculiar wording shows that the real ground on which the parties then supposed they might treat them as null, was the default which had been made in payment, by means of which, to use their term, they had "reverted."

Objections were taken by complainant to some portion of defendants' evidence, but we have not deemed it important to examine them, since the equitable right of defendants to relief clearly appears from the statements of Converse himself. upon the stand. We have carefully in the course of our opinion abstained from speaking of the acts of complainant as intentionally dishonest, and from characterizing them with harshness. We have been obliged to say of his statements that they were untrue, and made on his part with knowledge that they were so. But we will not undertake to say that he did not convince himself by some process of reasoning that they were correct. The legal aspect of the case would not be different if we came to that conclusion, since the courts must look at the effect of untrue statements upon the person to whom they are made, rather than to the corrupt motive of the one making them. If one obtains the property of another, by means of untrue statements, though in ignorance of their falsity, he must be held responsible as for a legal fraud.— *Ainslie v. Medlycott*, 9 *Ves.* 21; *Taylor v. Ashton*, 11 *M. & W.* 401; *Smith v. Richards*, 13 *Pet.* 26; *Lockridge v. Foster*, 4 *Scam.* 569; *Smith v. Babcock*, 2 *Wood & M.* 246; *Tuthill v. Babcock, Id.* 298.

As the lots purchased were deeded by Converse to Blum-

rich, it might be desirable to end all litigation between the parties by enforcing payment of the balance due to Converse, by decree in this suit, if we could properly do so under the pleadings. But the bill is filed for the sole purpose of foreclosing the mortgage; and whatever other rights complainant may have, they cannot be enforced in this suit if the mortgage fails. It has been several times held by this Court, that the complainant can only recover on the case made by his bill; and he is entitled to no relief on equities only brought into the case by subsequent pleadings or by evidence.—*Peckham v. Buffam*, 11 *Mich.* 529; *Perkins v. Perkins*, 12 *Id.* 456; *Moran v. Palmer*, 13 *Id.* 367. Undoubtedly the complainant retains a vendor's lien upon the land, which he may enforce in equity if defendants refuse to pay:— *Carroll v. Van Rensellaer*, *Har. Ch.* 225; *Palmer et al. appellants*, 1 *Doug. Mich.* 422; *Sears v. Smith*, 2 *Mich.* 243; *Mowrey v. Vandling*, 9 *Id.* 39, but it must be enforced in a suit brought for that purpose.

The decree of the Court below must be reversed, and the complainant's bill dismissed, with costs of both courts.

CAMPBELL and CHRISTIANCY JJ. concurred.

MARTIN CH. J. did not sit in this case.