**NATIONWIDE MOTORIST ASSOCIA-TION OF MICHIGAN, INC.,** Nationwide Motorist Association of Ohio, Inc., Fred Mitchell, Edward Nedwick, Louis Hoekstra and Willard A. Rink, Plaintiffs,

v.

**NATIONWIDE MOTORIST ASSOCIA-TION, INC.,** Gurn Freeman, Jack Freeman and William Doyle, Defendants.

Civ. A. No. 4969.

United States District Court
W. D. Michigan, S. D.

Sept. 15, 1967.

See also D.C., 244 F.Supp. 490.

Varnum, Riddering, Wierengo & Christenson, Grand Rapids, Mich., F. William Hutchinson, Grand Rapids, Mich., of counsel, for plaintiffs.

Warner, Norcross & Judd, Grand Rapids, Mich., Thomas R. Winquist, Grand

Rapids, Mich., Friedman, Koven, Salzman, Koenigsberg, Specks & Homer, Chicago, Ill., of counsel, for defendants.

## OPINION

FOX, District Judge.

This is an action brought by plaintiffs, Nationwide Motorist Association of Michigan, Inc., Nationwide Motorist Association of Ohio, Inc., Fred Mitchell, Edward Nedwick, Louis Hoekstra, and Willard A. Rink, against defendants, Nationwide Motorist Association, Inc., Gurn Freeman, Jack Freeman, and William Doyle, to recover damages for certain alleged material misrepresentations.

Count I of the amended complaint states that the individual defendants made material misrepresentations which induced plaintiffs to purchase the statewide distributorship for Michigan, and subsequently organize and operate the plaintiff Michigan corporation pursuant to the terms of the franchise agreement.

Count II of the amended complaint alleges that as a result of the misrepresentations set forth in Count I, plaintiff Fred Mitchell purchased the statewide distributorship for Ohio for the benefit of the plaintiff Ohio corporation formed after his purchase of the distributorship.

Plaintiffs seek damages in Count I and rescission of the contract and return of the purchase price in Count II.

A trial on the merits was held before the court without a jury, with the facts standing as follows:

Plaintiff Nationwide Motorist Association of Michigan (hereinafter referred to as "Michigan corporation") was organized as a Michigan corporation on approximately March 29, 1963. It commenced doing business on April 1, 1963, with the following individuals as officers: Fred Mitchell, President; Louis Hoekstra, Executive Vice President; Edward Nedwick, Vice President; and Willard A. Rink, Secretary-Treasurer. Around March 11, 1964, plaintiff Nation-

wide Motorist Association of Ohio, Inc. (hereinafter referred to as "Ohio corporation") was organized.

Plaintiff Fred Mitchell was the Michigan distributor for Filter Queen Vacuum cleaners between 1959 and 1963. He is a high school graduate and attended Grand Rapids Junior College for two years.

Plaintiff Willard A. Rink is a college graduate. After graduation in 1955 he worked for a certified public accounting firm in New York state for eight months and then returned to Grand Rapids to work for Old Kent Bank & Trust Company, where he was employed until April 1963.

Plaintiff Louis Hoekstra has a Bachelor's Degree in economics and business administration, and a Master's Degree in education. He was employed as an instructor at Grand Rapids Junior College before his association with plaintiff corporations.

Plaintiff Edward Nedwick was a salesman for Thomas A. Edison Industries for many years before 1963.

None of the individual plaintiffs had any experience with the insurance industry or auto club industry before their affiliation with the Michigan corporation.

Defendant Nationwide Motorist Association, Inc. (hereinafter referred to as "NMA" or "National") is a Delaware corporation with its principal place of business in Rolling Meadows, Illinois.[1]

Defendant Gurn H. Freeman was President and chief executive officer of NMA at all relevant times.

Defendant Jack W. Freeman was Executive Vice President of NMA until his resignation in May of 1964.

Defendant William Doyle was a Vice President of NMA, engaged principally in selling dealerships and training salesmen until September of 1964, when he left the employ of NMA.

---

1. We use "NMA" or "National" because witnesses at the trial referred to Na-
tionwide Motorist Association, Inc. in this manner.

NMA was incorporated in 1957 to operate a national association of affiliated motor clubs. Its services allegedly include travel guidance, bail bond coverage, private police protection, travel insurance, and emergency towing and road service.

One method NMA used to implement its program on a national level was the sale of franchises on a statewide basis through the establishment of distributorships. The primary function of a distributorship was to sell sub-franchises to dealers, normally insurance agencies, which would act as retail outlets to the public. This distributorship system forms the subject matter of the instant action.

The first contract any plaintiff had with any member or representative of NMA was in October or November of 1962 when plaintiff Fred Mitchell became acquainted with a Mr. Leroy Den-Besten, a salesman for NMA in the Grand Rapids area.

During the remainder of 1962 Mitchell and DenBesten met three or four times to discuss NMA. At one of their first meetings DenBesten gave Mitchell three NMA pamphlets, "Crossroads," "Growth of a Franchise Empire," and "Guide to Your Services," describing its operation and purposes. At their third meeting they reviewed "Crossroads" and "Growth of a Franchise Empire."

Over the course of these meetings Den-Besten told Mitchell there were 17,000 insurance agencies in Michigan; there was no reason why Mitchell could not get at least 1500 to 2000 of these agencies as dealers; and past experience indicated that he could expect an 88% renewal rate of memberships in 1963.

Following their third meeting, when for the first time they discussed the possibility of Mitchell becoming a statewide distributor for NMA, Mitchell and DenBesten drove to Rolling Meadows to meet with Gurn Freeman. Freeman reviewed the automobile club business with Mitchell and examined his background to determine whether Mitchell was qualified to operate an NMA franchise.

During this meeting Freeman stated that NMA was the second largest association of its kind in the world; a half million members was a conservative estimate; it could be shown that renewal memberships would be 88% or better; George Hargrave of Hargrave's Secret Service invested $500,000 in NMA when it was first organized; the motor club he operated in Gary, Indiana was organized at $10 a share and sold at $250,000 profit, and this money was used along with other monies to start NMA; National's franchising program took the "if" out of the business; Mitchell would not fail if he followed NMA's program; and National's program was extremely profitable on both the agency and statewide distributorship level. Freeman refused to disclose any specific financial information about NMA or about its memberships.

On January 24, or 25, 1963, after a trip with Gurn Freeman to Charlotte, North Carolina to observe a motor club in operation, Mitchell met with Freeman in Rolling Meadows to discuss a proposed franchise agreement for the purchase of the Michigan franchise. At this meeting Gurn Freeman prepared a three-year projection based on data allegedly from NMA operations, which indicated a Michigan distributorship would have no difficulty in establishing 500 dealers per year, which in turn could enlist 50,000 memberships per year. According to this projection the net worth of the Michigan corporation's stock at the end of each of its first three years of operation would be $125,068.08, $272,122.72, and $609,975.52. The projection also included expense figures for the Michigan operation.

In discussing the proposed Michigan franchise agreement, Mitchell expressed reservations about a provision in the contract requiring the owner to sell and/or renew 5,000 memberships per year. Freeman assured Mitchell that he would meet the quota and that the provision was only placed in the contract to prevent speculation and that National had never cancelled anyone for failure to

meet the quota. He stated that if the Michigan franchise were held solely as a speculative investment, it would be worth $125,000 to $130,000 within a year or two without any effort on Mitchell's part.

On January 25, 1963, Mitchell signed the agreement and a down payment of $3,500 was made shortly thereafter.

During the period between Mitchell's first meetings with DenBesten and Freeman and the signing of the Michigan franchise agreement, Mitchell also was in contact with Edward Nedwick and Willard Rink regarding participation by them in the Michigan distributorship. He related his discussion with DenBesten and Freeman to them, and also gave them "Crossroads" to examine. Rink was responsible for arranging loans to Mitchell and Nedwick for the down payment.

Following the execution of the franchise agreement, Mitchell began to seek investors for the Michigan corporation. About this time Louis Hoekstra became involved with the other individual plaintiffs in the initial organization of the Michigan corporation. In early February, Mitchell, Rink, Nedwick and Hoekstra discussed and examined the projection prepared by Gurn Freeman and other aspects of the business.

On March 13, or 14, Gurn and Jack Freeman, Mitchell, Nedwick, Rink and Hoekstra met in a restaurant in Grand Rapids. This was the first time the Freemans had met Rink, Nedwick and Hoekstra. In a series of individual discussions Gurn Freeman told Rink he had raised about one million dollars to start National; George Hargrave of Hargrave's Secret Service had invested a half million dollars in NMA; National was so successful that no financial statement could be given because it might blueprint NMA's success for its competitors. Jack Freeman observed to Rink that National had in excess of 1,000,000 members; National's experience in renewal rates was approximately 90% (NMA was " * * * realizing a higher renewal percentage than AAA," T. 039); due to his activities in the motor club business Gurn Freeman was a multimillionaire; and that the Rolling Meadow's office had approximately seventy-five leads for the Michigan corporation.[2]

As a result of the representations made by defendants Gurn and Jack Freeman during this meeting, Rink and Hoekstra decided to join with Mitchell and Nedwick and subsequently invested their own and borrowed monies in the Michigan corporation.

On April 1, 1963 the Michigan corporation became operative. During the first two weeks of April William Doyle and Jack Couls conducted training sessions. At one of the training sessions Doyle stated in the presence of Rink there were 13,500 insurance agencies in Michigan and when Nationwide Insurance Co. offered one million dollars for NMA's name, Gurn Freeman had merely laughed. Estimates of memberships in National ranged from 1,000,000 to 3,-500,000; renewal rates were said to be 80% or better. National's literature used in the training sessions included "Crossroads," "Growth of a Franchise Empire," "Owner's Manual," and "Guide to Your Services."

At the end of the first week of training sessions, a check for $31,500, the balance of the purchase price for the Michigan franchise, was delivered to Doyle.

At the close of the training session, Mr. Rink accompanied Mr. DenBesten on a field trip to observe and learn selling methods. On one occasion DenBesten showed a prospective insurance agent a piece of literature about a National Motor Club in California, which stated that the club had a membership of 300,000 and an 88% renewal rate. After leaving the agency, Rink observed to DenBesten that the material given to the agent did

---

**2.** Hoekstra also testified that Jack Freeman said "the National had well over a million members; that Gurn Freeman was or was very shortly to become a millionaire due to his tremendous efforts and progress and success of the National." (T. 421)

not refer to National, but to another competing motor club in the State of California. DenBesten replied that what the agent didn't know wouldn't hurt him, and that National's renewal rates were in the same category.

Some time before, or shortly after the formation of the Michigan corporation, Gurn Freeman told Mitchell that the Ohio franchise was available for $70,000. When he asked why the Ohio franchise cost twice as much as the Michigan franchise, Gurn Freeman explained that the Michigan franchise was sold under the old price list and that it should have been sold for $50,000.

Mitchell and Freeman subsequently agreed that if he could persuade the other plaintiffs to purchase the Ohio franchise, Freeman would pay him $10,000 as a finder's fee. Near the end of April 1963, Hoekstra and Mitchell traveled to Rolling Meadows with $15,000 raised by Hoekstra, Rink and Nedwick. At the closing on April 26, 1963, Gurn Freeman gave Mitchell a check for $10,000 which he endorsed back to Freeman as a part of the down payment of $25,000.[3]

The Ohio franchise was issued in the name of Mitchell. The balance on the Ohio franchise was paid between April 26, 1963 and October 1963. Plaintiffs intended to develop the Ohio franchise along with the Michigan corporation so they could be operated as one enterprise. The Ohio corporation was formed in March of 1964, but it never became operative.

During May and June, even with the assistance of representatives from NMA, business progressed very slowly. In July Rink and Hoekstra went to Rolling Meadows to meet with Jack Freeman in an attempt to persuade NMA to reduce the initiation fee for new dealers from $375 to $50. Jack Freeman declined to reduce the fee, asserting that past experience had established $375 as a successful membership fee. In response to questions about the quota provisions requiring 5,000 memberships in the first year, Jack Freeman assured them that the provision was only meant to prevent speculation and that NMA had never cancelled any franchise for failure to meet its quota.

In August, Mitchell obtained a copy of National's June 11, 1963 unadjusted financial report to its stockholders. This was the first financial information about NMA plaintiffs had seen. They concluded that if NMA had over 1,000,000 members it was not reflected in the annual report, and that they should meet with the Freemans. Accordingly, in August they traveled to Rolling Meadows for a conference with Jack and Gurn Freeman. When told of their concern, Gurn Freeman explained that after paying substantial expenses he made only a nickel a member, and that it was unexplainable to him how anyone could find fault with a statement manifesting a current ratio (current assets to current liabilities) of 56 to 1.[4] In addition, he indicated that National was considering a public sale of stock to raise a million dollars for a National advertising and promotion program.

Although Gurn Freeman refused to give them a breakdown of the figures contained in the shareholders' report, the plaintiffs estimated that $70,000 of the income reported in the June 11 report probably came from the sale of memberships. They arrived at this figure by deducting from the total income reported in the statement monies which they knew had been paid for the purchase of statewide distributorships. On this basis they concluded that at a nickel a

---

3. This transfer of the $10,000 check from Freeman to Mitchell and back to Freeman was in reality a paper transaction and without substance.

4. The 56 to 1 ratio was inconsequential and irrelevant because it resulted from distributorship sales rather than membership sales, the latter being the test of growth and stability. In addition, the sale of distributorships without a proportionate sale of memberships is more like the distribution of a chain letter from which only the top few gather any return.

member National had well over one million members. This, together with Gurn Freeman's observations on National's desire to enlarge its advertising and promotional program persuaded the plaintiffs to remain in business.

Parenthetically, at this meeting or shortly thereafter, Jack Freeman told Hoekstra and Rink that National had spent $38,000 to $40,000 in Iowa testing various advertising techniques to determine what type of advertising was best suited for their purposes. This was allegedly done in anticipation of the $1,000,000 National advertising and promotion program described by Gurn Freeman.

Business did not improve in August or September, and consequently Mitchell and Nedwick tentatively resigned from the corporation in September. In late September or early October, Hoekstra and Rink again returned to Rolling Meadows to inform the Freemans that Mitchell and Nedwick were no longer active in the corporation. After a discussion of their problems, it was agreed that the Michigan corporation needed more capital, which Gurn Freeman agreed to provide through a loan of $60,000. Encouraged by Freeman's promise of a loan, Rink and Hoekstra again decided to continue operating the Michigan corporation.

In a letter dated October 21, 1963, Rink and Hoekstra restated their difficulties and agreed to accept responsibility for the purchase of the Ohio franchise. They also made suggestions respecting improvement of the financial condition of the Michigan corporation, which at this time was desperately in need of funds.

After October 1, a sales manager and three salesmen were hired on a full-time basis to conduct the business of the Michigan corporation in order to allow Rink and Hoekstra time to raise capital for the Ohio franchise.

In January of 1964, Hoekstra and Rink began to rewrite the contracts used in the sale of dealerships to independent insurance agencies by eliminating the requirement that an agency pay $375 to become a dealer. NMA did not object to this modification of the dealership contract. Sales improved following this change.

By late 1963 or early 1964, Rink and Hoekstra had heard nothing further on the public sale of stock by National. In March of 1964, they learned that the S. D. Fuller Co. was going to underwrite the sale of stock for National and sent for a prospectus. After receiving and studying the prospectus, they discovered that many of the representations made by the defendants were false.

At a meeting in Gurn Freeman's office in Rolling Meadows in early April 1964, Rink and Hoekstra presented the prospectus to him. When confronted with it, Freeman left his office and there was no further personal contact between Rink and Hoekstra and Gurn Freeman after that time.[5]

Thereafter, Rink and Hoekstra decided that the Michigan and Ohio franchises should be sold. Mr. Joseph Fitzgerald, an executive vice president of National, agreed to assist them in the sale of the franchises. Fitzgerald asked for financial information and reasons why plaintiffs had suffered a loss because, he observed, there were always people willing to buy another company's loss and use it for income tax purposes. He suggested that in preparing the above information they should also stress that the failure of the corporations was due primarily to the incompetence of Mitchell and Nedwick, since this would indicate to prospective purchasers that the corporations might have value. In compliance with these requests, Hoekstra and Rink prepared and mailed to Fitzgerald on May 7, 1964 various financial state-

---

5. Plaintiffs continously relied upon defendants' representations with varying intensities until conclusion of the meeting with Gurn Freeman in early April 1964.

ments and a document entitled "General Comments."[6]

On July 23, 1964, Hoekstra received two letters from National about the Michigan and Ohio franchises. In these letters National commented for the first time on the failure of the Michigan and Ohio corporations to meet the quotas contained in the contracts, and stated that unless certain terms set forth in the letters were observed, the franchises would be cancelled. In essence, National ordered the corporations to pay $1.00 for each member under the quotas and to submit a plan of operation indicating that the corporations could be run successfully. The offers in these letters were not accepted by plaintiffs.

On August 11, 1964, Messrs. Rink and Hoekstra received official notification of the cancellation of both the Michigan and Ohio franchises.[7]

The March 26, 1964 prospectus of NMA establishes unequivocally that the

6. Rink testified about Fitzgerald's suggestions at pages 124-6 of the trial transcript. The documents prepared by Rink and Hoekstra were marked as plaintiffs' exhibits 19 and 21.

Rink testified with respect to the meeting as follows:

"Q. Will you tell us what transpired at that meeting?

A. We basically went in to talk to Mr. Freeman. At the time we entered his office, he was not aware of the fact that we had a prospectus or any knowledge of what the prospectus contained. We just began the conversation with him by talking generally about the business. He again reflecting back on his great successes in his business. And while he was talking, Mr. Hoekstra reached in his inside pocket and pulled out the prospectus and said, Don't let me interrupt you, I am just following along with some of the things that you are saying. At this point Mr. Gurn Freeman showed some irritation, got up from his desk and walked out of the office. And from this point forward we never talked to him again.

Q. You say "we never talked to him"; did he ever talk to you?

A. No.

Q. All right. This was in early April, 1964?

A. That is correct.

Q. Did you determine to continue with the business at that point, or to take any other action?

A. Our intent from this point on was to relieve ourselves of these franchises in whatever manner we felt we could do so."

This meeting occurred before defendant's revocation of the franchises.

7. Plaintiff's memorandum in support of their proposed findings of fact and con-

clusions of law discusses the quotas in the following language:

"There are a number of important facts to consider in connection with the quotas. In the first place, the plaintiffs at various times here involved held three franchises, Michigan, Ohio and Indiana. Each franchise required the sale of 5,000 members per year. Had these quotas ever been met, the plaintiffs alone would have sold more memberships than sold by all distributors for the defendant corporation from March 15, 1960 to January 2, 1964. (P. Ex–33, p. 14) *This lends strong support to the claim that the plaintiffs were told that these quotas were not to be enforced and that they were merely put in the agreements to prevent speculation. Of course, in fact, this ultimately turned out to be false, and the franchises were cancelled for failure to meet the quota requirement.*

"In spite of the defendants' insistence that the quota provision meant exactly what it said, the evidence through the numerous franchise agreements introduced by the plaintiffs and the answers to interrogatories filed by the defendants indicates that these quota provisions were in fact not enforced in any understandable pattern. (Tr. 590–595) Furthermore, if one *adds up the total* quota provisions in franchises issued prior to the sale of the Michigan franchise and during 1963 when the Michigan and Ohio franchises were *most* active, and then compare that total with the actual experience of the defendant corporation in the sale of memberships, it is readily apparent that the quota provision was a one-way street *contrived to give the defendants a tool whereby they could cancel states and resell them.*" (Emphasis supplied.)

The evidence in the case supports this conclusion.

total membership of the National never exceeded 22,975 from December 31, 1959 to December 31, 1963; National did not keep records regarding the percentage of memberships renewed each year; in 1961 and 1962 National suffered losses and in 1962 its net earnings were only $5,-192; except during 1963 the company did not enjoy substantial earnings; NMA is a very minor factor in the automobile club business; there are at least six motor clubs larger than National; and Nationwide Mutual Insurance Company filed an opposition to NMA's application in the United States Patent Office for registration of its trademark.

Evidence in the case compels the conclusion that book value of NMA shares held by Gurn Freeman never exceeded $90,000, that George Hargrave never invested $500,000 in NMA, and finally, Nationwide Mutual Insurance Company never offered to purchase NMA's name.

Willard Rink testified that according to a statistical sampling of independent insurance agencies made by him and Hoekstra, there were approximately 4,-000 such agencies in Michigan. He also testified that a majority of the 70 to 80 new leads, allegedly available to the new Michigan corporation, had already been contacted by representatives of National before formation of the Michigan corporation, and we so find.

In light of these facts and past experience of NMA, the three year projection prepared by Gurn Freeman was misleading and fraudulent. Indeed, if the Michigan corporation could have sold as many memberships as Gurn Freeman guaranteed it would in its first year of operation it would have succeeded in selling more memberships than any other distributorship had sold in the entire history of NMA. We believe this fact alone supports plaintiffs' contention that they were told that the franchise would not be cancelled for failure to meet the membership quotas. (See Footnote (7), supra.)

Gurn and Jack Freeman intended to create the impression that NMA was a highly successful and profitable motor club association, when in fact what success NMA had enjoyed was due principally to the sales of distributorship franchises.

For example, "Growth of a Franchise Empire," implies the actual existence of an empire with Gurn Freeman as the successful overlord. The tone of the booklet read in context of defendant's misrepresentations that Gurn Freeman had built an empire in which he became a millionaire suggests that "you too can become an emperor and a millionaire, if you purchase a franchise."

The defendants' boast that it was the second largest motor club association in the world illustrates the fraudulent design of the defendants. Although the statement is literally true, NMA admitted in its March 1964 prospectus that it is in competition with six other larger organizations.

■ A partial truth, as well as a truth taken out of context and used as bait to defraud and deceive, is an actionable false representation.

Defendants' fradulent scheme was successful because Gurn and Jack Freeman were able to withhold crucial information from the plaintiffs even though numerous requests were made for it. Because they treated this information as if it were a trade secret, plaintiffs relied upon the representations and statements of Jack and Gurn Freeman and their agents.

Rink testified: "I think it was a matter of relying on the basic honesty of the people involved." (T. 206)

We find that all of the plaintiffs relied on the information furnished them by the defendants in the same manner and fashion that Rink did. This reliance resulted in the purchase of the Michigan and Ohio franchises and the formation and operation of the Michigan corporation and the incorporation of the Ohio corporation. It was not until the plaintiffs received a copy of National's 1964 prospectus that they fully realized the truth about NMA. Defendants' fraud had already borne fruit by then, however.

Although the combination of Rink's and Hoekstra's academic backgrounds, and Mitchell's and Nedwick's selling experiences suggests that the plaintiffs were qualified to engage in the operation of a statewide franchise, it was apparent to the court that plaintiffs lacked both the business acumen and skepticism necessary to permit them to make an accurate appraisal of NMA and the potential of the Michigan and Ohio corporations. Plaintiffs relied almost exclusively on the integrity and honesty of the defendants and their agents. The defendants capitalized on this confidence by mesmerizing the plaintiffs into believing that with the backing of National they could enlist thousands of members into one of the fastest growing, pace-setting automobile clubs in the world.

■ Diligence on the part of the plaintiffs might have resulted in discovery of the fraud earlier than April of 1964. However, the law takes people as it finds them, and in Michigan no duty to use diligence in discovering a fraud is imposed on an injured party. People's Furniture & Appliance Co. v. Healy, 365 Mich. 522, 113 N.W.2d 802 (1962); Buckley v. Buckley, 230 Mich. 504, 202 N.W. 955 (1925); Yanelli v. Littlejohn, 172 Mich. 91, 137 N.W. 723 (1912); Lewis v. Jacobs, 153 Mich. 664, 117 N.W. 325 (1908).

It was once said that high fortune makes both our virtues and our vices objects which stand out clearly when brought to view by the light. In the instant case, plaintiffs believed the defendants could be trusted. Plaintiffs' trust was misplaced. Nonetheless, plaintiffs' mistaken judgment is not a ground for denying them relief.

In Judd v. Walker, 215 Mo. 312, 114 S.W. 979 (1908), Judge Lamm said:

"And, generally speaking, until there be written into the law some precept or rule to the effect that the heart of a man is as prone to wickedness as is the smoke to go upward, and that every man must deal with his fellow man as if he was a thief and a robber, it ought not to be held that trust cannot be put in a positive assertion of a material fact, known to the speaker and unknown to the hearer, and intended to be relied upon."

Defendants assert that the real reasons for the plaintiffs' failures are set forth in the documents Rink and Hoekstra sent to Joseph Fitzgerald on May 7, 1964. We disagree. (See page 881 supra.)

Plaintiffs purchased the Michigan franchise because they believed that in light of all that had been represented to them, which they believed to be true, it would be worth approximately $125,000 at the end of the first year of operation. If defendants' representations were true, plaintiffs probably would have had a franchise worth $125,000 at the end of its first year.

Other factors which may have been involved in the failure of the Michigan and Ohio corporations pale into insignificance when compared with the misrepresentations and fraud of the defendants. But for the representations of the defendants, the plaintiffs would have never become associated with NMA. These misrepresentations were the principal reasons for the damages the plaintiffs suffered.

■ Under Michigan law an action for damages based upon misrepresentation exists when a material representation has been made; the representation was false; the party making the representation knew that it was false at the time he made it, or he made it recklessly, without any knowledge of its truth as a positive assertion, or he made the statement in good faith, believing it to be true although false; the party made it with the intention it should be acted upon by the plaintiffs; plaintiffs acted in reliance upon the representation; and plaintiffs suffered injury as a result of such representation. Irwin v. Carlton, 369 Mich. 92, 119 N.W.2d 617 (1963); Smith v. Taber, 362 Mich. 619, 107 N.W. 2d 761 (1961); Columbus Pipe & Equipment Co. v. Sefansky, 352 Mich. 539,

90 N.W.2d 492 (1958); McIntyre v. Lyon, 325 Mich. 167, 37 N.W.2d 903 (1949); Converse v. Blumrich, 14 Mich. 109.

■ We viewed the witnesses during the trial and observed their demeanor and conclude that the testimony of Gurn and Jack Freeman and William Doyle lacks any substantial credibility, and that the following misrepresentations were material and false: that the defendant corporation had over one million members; the defendant corporation experienced membership renewals at the rate of 88%–90%; there were thirteen to seventeen thousand independent insurance agencies in the State of Michigan available as dealers for the sale of memberships in Michigan; Gurn Freeman after starting his business with a substantial debt, had been so successful that he was a millionaire at the time the Michigan and Ohio franchises were sold to plaintiffs; NMA had enjoyed solid financial success in the years preceding the negotiations for the Michigan and Ohio franchises; Nationwide Mutual Insurance Company offered the defendant corporation over one million dollars for the company name; the defendant corporation had grown to be the second largest association of its kind in the world; the membership quota contained in the Michigan and Ohio franchise agreements was meaningless and had not been and would not be enforced, and was placed there only to prevent speculation; the National office had 70 to 80 new leads for the Michigan corporation to use in contacting independent insurance agencies in the State of Michigan; George Hargrave, when the defendant corporation was organized, gave Gurn Freeman a check for $500,000 to be used as working capital in the defendant Michigan corporation; the Michigan corporation based on results experienced by other franchise holders could sell 500 dealerships, 50,000 master memberships, and 25,000 associate memberships in its first year of operation; and the Michigan corporation based on the results being experienced by other franchise owners, could expect a net worth of $125,000 after one year of operation.

Defendant corporation and the individual defendants, Jack and Gurn Freeman, made the above statements and representations with the intent to defraud and deceive plaintiffs, knowing that they were false and knowing plaintiffs would act on them to their detriment.

■ Defendants Gurn and Jack Freeman personally participated in making these representations. As President and Executive Vice President, they were responsible for the acts of their employees, Messrs. DenBesten, Doyle and Couls. Mason v. Vogue Knitting Corp., 361 Mich. 481, 105 N.W.2d 412 (1960). Accordingly, under Michigan law they can be held individually liable to the plaintiffs for their own misrepresentations and the misrepresentations of their agents.

While William Doyle was a Vice President and Director of the defendant corporation, and a willing participant in the fraudulent scheme of the defendants Jack and Gurn Freeman and the defendant corporation, we find that he was an officer in name only and not in substance. We do find that his representations were false and that plaintiffs relied upon them, but Gurn and Jack Freeman were the motivating, controlling force in the corporation.

Relying on the statements and representations of defendants Gurn and Jack Freeman and the defendant corporation's agents, plaintiffs formed and participated in the Michigan and Ohio corporations. Their reliance continued until the early part of April 1964, when they met with Gurn Freeman in Rolling Meadows.

■ Under Count I plaintiff corporation seeks to affirm the transactions between the defendants and the Michigan corporation. Michigan law provides that in these circumstances plaintiffs are entitled to the difference between the actual value of the contract when it was made and the value of the contract had the representations of the defendants been true. Gross v. Morosky, 366 Mich.

114, 113 N.W.2d 863 (1962); Paquin v. Van Houtum, 343 Mich. 111, 72 N.W.2d 169 (1955). The Paquin court quoted with approval the rule of damages set forth in 24 Am.Jur., Fraud and Deceit, § 227:

"The great weight of authority sustains the general rule that a person acquiring property by virtue of a commercial transaction, who has been defrauded by false representations as to the value, quality, or condition of the property, may recover as damages in a tort action the difference between the actual value of the property at the time of making the contract and the value that it would have possessed if the representations had been true. In other words, the defrauded party is entitled to recover the difference between the real and the represented value." 343 Mich. at 123, 72 N.W.2d at 176.

We find that between January 1963 and April 1963, the value of the Michigan contract was nil. Its value had defendants' representations been true, would have been reasonably worth $50,000.[8] Plaintiff Michigan corporation is entitled to a judgment against the individual defendants Jack and Gurn Freeman and the defendant corporation NMA, jointly and individually, in the amount of $50,000.

Under Count II plaintiff Ohio corporation seeks rescission of the Ohio franchise agreement and return of the purchase price. Cancellation of the Ohio franchise was a part of the fraudulent scheme of the defendants, and therefore, plaintiff Ohio corporation is entitled to rescission of its contract with the defendant corporation and return of the purchase price, $60,000, which is the amount plaintiffs actually paid for the Ohio franchise, less the paper transaction between Gurn Freeman and Mitchell. Wolbrink v. Sorr, 341 Mich. 512, 67 N.W.2d 688 (1954); Lash v. Prokop, 331 Mich. 390, 49 N.W.2d 343 (1951); Westman v. Brumm, 248 Mich. 387, 227 N.W. 764 (1929).

The court has considered the entire record, all of the briefs, and the proposed findings of the parties in reaching this decision.

The findings of fact and conclusions of law in this opinion shall be deemed to be findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

A judgment shall be entered in accordance with this opinion.

---

8. "Q. Did he tell you what the price [of Ohio franchise] was?
A. Seventy thousand dollars.
Q. What did you respond to that?
A. I wanted to know, What's the big deal? Seventy thousand dollars. I paid $35,000 for Michigan. He said, Now, wait a minute. If you remember correctly, when you came into the office to buy this franchise DenBesten had an old price list. And the price of Michigan was supposed to have been $50,000. But because DenBesten had aleady quoted you a figure of $35,000, I had to stick with that. And $70,000 is the price of Ohio. He said, You got a knockdown on the price of Michigan as it stood in the first place. I said, Well, it was not my fault, I didn't know what the price was."
(T. 367–368.) (Testimony of Mitchell regarding conversation with Gurn Freeman with respect to price of Ohio franchise.)